# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DAWN M. JONES,

            **Plaintiff,**

    v.

GOLDEN RULE INSURANCE
COMPANY,

            **Defendant.**

        **1:16-cv-3678-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant Golden Rule Insurance Company's ("Defendant") Motion for Summary Judgment [9].

## I.    BACKGROUND

### A.    Facts

On April 16, 2014, Plaintiff Dawn M. Jones ("Plaintiff") had a routine mammogram as part of her annual physical.  (Deposition of Dawn Michele Jones (Mar. 22, 2017) [38.3] ("Pl. Dep.") at 97-100; [9.7]).  Plaintiff had received annual mammograms for the past "several years," and neither Plaintiff nor her physician was aware of any signs of cancer in Plaintiff's breasts.  (Deposition of Michael DuBois, M.D. (Mar. 29, 2017) [38.2] ("DuBois Dep.") at 101; [9.7]).

On May 13, 2014, the radiologist reviewed the mammogram results and

issued the following written report ("May Report"):

> FINDINGS:  The breast tissue is heterogeneously dense (BI-RADS
> Type III Density).  The breast has more areas of fibrous and glandular
> tissue (from 51 to 75%) that are found throughout the breast.  This can
> make it hard to see small masses (cysts or tumors).  Linearly
> distributed calcifications are noted in the right axillary tail posteriorly.
> No dominant masses, calcifications, or indirect signs of malignancy
> are identified in the left breast.
>
> IMPRESSION:
>
> 1.  Incomplete:  Need additional evaluation (BIRADS 0)
>
> RECOMMENDATION:  Spot magnification views in the right XCCL
> and right ML should be performed.[1]  Additionally, possible right
> breast ultrasound should be performed.

([9.7] at 2).  Plaintiff's mammogram results were "abnormal" in view of the

"[l]inearly distributed calcifications" found in her right breast.  (DuBois Dep. at

102, 110, 118-120; Pl. Dep. at 169).  The calcifications were "suggestive of

possible cancer," although "you can find micro-calcifications in normal breasts."

(DuBois Dep. at 105, 116, 122-123, 172).

On June 25, 2014, Plaintiff submitted an application to Defendant for

short-term health insurance coverage.  (Defendant's Statement of Undisputed

---

[1]    A "spot magnification view" is a magnified mammogram focused on a
specific area of the breast.  http://www.imaginis.com/mammography/ special-
mammography-views-spot-compression-and-magnification-views.

Material Facts in Support of its Motion for Summary Judgment [9.2] ("DSMF")

¶ 1).  Plaintiff certified, on the application form, that she understood "no benefits

will be paid for a health condition that existed within the last 5 years prior to the

date insurance takes effect."  ([9.4]).  Plaintiff's application was accepted on

June 25, 2014, and the insurance policy ("Policy") was issued providing coverage

from June 26, 2014, through December 25, 2014.  (Pl. Dep. at 140-142; DSMF ¶ 3;

[9.5] at 23).  The Policy reiterated what was disclosed on Plaintiff's application

form, specifically, that "*Preexisting conditions* will not be covered under this

*policy*."  (DSMF ¶ 9).  The Policy defined the term "preexisting condition:"

> *'Preexisting Condition'* means a condition:
>
> (A)  For which medical advice, diagnosis, care, or treatment was recommended or received within the 60 months immediately preceding the date the *covered person* became insured under this *policy*;
>
> (B)  That, in the opinion of a qualified *doctor*:
>
> >  1)  Began prior to the date the *covered person* became insured under this *policy*; or
> >
> >  2)  Manifested symptoms that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care, or treatment within the 60 months immediately preceding the date the *covered person* became insured under this *policy*; or
>
> (C)  A pregnancy existing on the effective date of coverage.

3

(DSMF ¶ 9).

On July 14, 2014, Plaintiff received a copy of the May Report.  (Pl. Dep. at 155).  She had a follow-up mammogram later that day, which revealed a "mass with calcifications span[ning] 3 cm in the right axillary tail."  ([36.3]).  The radiologist's report noted that "[t]he calcifications are pleomorphic and the mass is irregular."  ([36.3]).  The radiologist found the results "suspicious (BIRADS 4)" and recommended an "ultrasound-guided biopsy of the mass."  ([36.3]).  After undergoing a biopsy on August 4, 2014, Plaintiff was diagnosed with invasive ductal carcinoma, a form of breast cancer.  ([9.8] at 3; DuBois Dep. at 93-94; [36.5] at 3).  On September 29, 2014, cancer surgery was performed.  ([9.8] at 3; [36.6] at 6).  On December 19, 2014, Defendant told Plaintiff that the treatment she received for her breast cancer was excluded under the Policy.  (DSMF ¶ 19).

B.   Procedural History

On September 30, 2016, Plaintiff filed her Complaint for Damages [1], asserting claims for breach of contract (Count 1), breach of the duty of good faith and fair dealing (Count 2), bad faith and attorney's fees (Count 3), and punitive damages (Count 4).  The Complaint alleges that Defendant "breached its duties under the insurance contract by refusing to pay covered medical expenses."  (Compl. ¶ 32).  On November 21, 2016, Defendant filed its Motion for Summary

4

Judgment on the grounds that Plaintiff's breast cancer was a preexisting condition not covered by the Policy.

## II.   LEGAL STANDARDS

### A.   Summary Judgment Standard

"Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1309 (N.D. Ga. 2016); see Fed. R. Civ. P. 56.  "An issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" W. Grp. Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. at 1361 (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by

showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1281-82 (11th Cir. 1999). The moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." Celotex, 477 U.S. at 323. Once the moving party has met its initial burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham, 193 F.3d at 1282. The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48.

"If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." Apcoa, Inc. v. Fid. Nat. Bank, 906 F.2d 610, 611 (11th Cir. 1990) (internal quotation marks omitted) (quoting Anderson, 477 U.S. at 250). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)); cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (a party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict" (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (internal quotation marks omitted))).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury." Graham, 193 F.3d at 1282. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." Id.

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 322-23; see Freeman v. JPMorgan Chase Bank N.A.,

-- Fed. App'x --, 2017 WL 128002, at *4 (11th Cir. Jan. 13, 2017) (same);

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir. 1999) ("If the

non-movant in a summary judgment action fails to adduce evidence which would

be sufficient, when viewed in a light most favorable to the non-movant, to support

a jury finding for the non-movant, summary judgment may be granted.").

  B.  Insurance Contract Interpretation under Georgia Law

  "Insurance in Georgia is a matter of contract and the parties to the contract

of insurance are bound by its plain and unambiguous terms."  Hurst v. Grange Mut.

Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996); see Yeomans & Assoc. Agency,

Inc. v. Bowen Tree Surgeons, Inc., 618 S.E.2d 673, 677 (Ga. Ct. App. 2005)

("[A]n insurance policy is simply a contract, the provisions of which should be

construed as any other type of contract.").

  When language in the insurance policy "is explicit and unambiguous, the

court's job is simply to apply the terms of the contract as written, regardless of

whether doing so benefits the carrier or the insured." Georgia Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016); see Donaldson v. Pilot Life Ins. Co., 341 S.E.2d 279, 280 (Ga. Ct. App. 1986) ("Where the language fixing the extent of coverage is unambiguous, . . . and but one reasonable construction is possible, this court must enforce the contract as written."). "[T]he plain meaning of the terms must be given full effect without straining to extend coverage where none was contracted or intended." State Farm Fire & Cas. Co. v. Bauman, 723 S.E.2d 1, 3 (Ga. Ct. App. 2012). "[A]n insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law." Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001) (internal quotation marks omitted) (quoting Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc., 466 S.E.2d 4, 6 (Ga. 1996)).

If the terms of the policy are ambiguous, "the statutory rules of contract construction [are] applied." Pomerance v. Berkshire Life Ins. Co. of Am., 654 S.E.2d 638, 640 (Ga. Ct. App. 2007). Ambiguities in the policy are "strictly construed against the insurer as the drafter of the document." Federated Mut. Ins. Co. v. Ownbey Enterprises, Inc., 627 S.E.2d 917, 921 (Ga. App. Ct. 2006); see Giddens v. Equitable Life Assur. Soc. of U.S., 445 F.3d 1286, 1297 (11th Cir. 2006) ("[W]hen a policy is ambiguous, or is capable of two reasonable

interpretations, it is construed in the light most favorable to the insured and against the insurer."). "[A] word or a phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one." Ownbey Enterprises, 627 S.E.2d at 921 (citation and internal quotation marks omitted); see Bogard v. Inter-State Assur. Co., 589 S.E.2d 317, 318 (Ga. Ct. App. 2003) ("Under Georgia law, an insurance contract is considered ambiguous only if its terms are susceptible to two or more reasonable interpretations."). "The rule that an insurance policy will be interpreted liberally in favor of the insured and strictly against the insurer, applies only if the language of the policy is ambiguous after application of other principles or canons of interpretation . . . and only if the ambiguity cannot otherwise be resolved." 16 Williston on Contracts § 49:16 (4th ed. May 2017 Update); see Hays v. Georgia Farm Bureau Mut. Ins. Co., 722 S.E.2d 923, 926 (Ga. Ct. App. 2012).

"[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide." Giddens, 445 F.3d at 1297 (citing O.C.G.A. § 13-2-1); see Pomerance, 654 S.E.2d at 640 ("The proper construction of a contract is a question of law for a court to decide.").

## III.   DISCUSSION

A.   <u>Count 1:  Breach of Contract</u>

Count 1 alleges that Defendant "breached its duties under the [Policy] by refusing to pay covered medical expenses related to Plaintiff's treatment for breast cancer." (Compl. ¶ 32).  Defendant argues that Plaintiff's breast cancer is a "preexisting condition" that is not covered under the Policy.

1.   <u>The Policy's Preexisting Condition Provision</u>

The Policy excludes coverage for "preexisting conditions," which it defines as follows:

*'Preexisting Condition'* means a condition:

(A)   For which medical advice, diagnosis, care, or treatment was recommended or received within the 60 months immediately preceding the date the covered person became insured under this policy;

(B)   That, in the opinion of a qualified *doctor*:

   1)   Began prior to the date the *covered person* became insured under this *policy*; or

   2)   Manifested symptoms that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care, or treatment within the 60 months immediately preceding the date the *covered person* became insured under this *policy*; or

(C)   A pregnancy existing on the effective date of coverage.

11

(DSMF ¶ 9).

The Court first considers whether the preexisting condition exclusion is ambiguous.  The Court finds it is not.  The preexisting condition provision contains three paragraphs, (A), (B), and (C), each separated by a semi-colon.  Each paragraph qualifies the "condition" for which coverage is excluded.  The Policy includes the word "or"—not "and"—between paragraphs (B) and (C).  "[T]he Georgia Supreme Court has clearly held that a . . . list divided by semicolons and concluding with 'or' is disjunctive rather than conjunctive."  Padgett v. City of Moultrie, 494 S.E.2d 299, 302 (Ga. Ct. App. 1997).  These grammatical road signs result in the provision defining three types of "preexisting condition," one of which, paragraph (B), has two subparts.

The most common condition that falls within paragraph (A) is one known to the insured in the five years before the insurance effective date.  Other conditions may, however, qualify as preexisting where indications of the condition were known before issuance of the Policy.

Paragraph (B) is slightly different.  It defines "preexisting condition" as a condition that, in the opinion of a "qualified doctor," either (1) "began prior to the date the *covered person* became insured" *or* (2) "manifested symptoms that would have caused an ordinarily prudent person to seek medical advice, diagnosis, care,

or treatment within the 60 months immediately preceding the date the *covered person* became insured."  Paragraph (B)(1) addresses a condition that may have been unknown to the insured but which in fact existed at the time coverage began. There is no requirement that the insured knew or could have known of the ailment. The exclusion applies where a "qualified doctor" opines that the condition existed before the insurance effective date.  Paragraph (B)(2) primarily addresses conditions that the insured should have known existed but for which the insured declined to seek medical services.

Paragraph (C) defines "preexisting condition" in plain and unambiguous terms.  If the insured was "pregnant" on the effective date of coverage, that condition is not covered.

The preexisting condition provision unambiguously excludes coverage for conditions that satisfy paragraph (A), (B) *or* (C), including conditions existing before the insurance effective date, whether known or unknown to the insurer or the insured.  "[A]n insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law."  Henning, 254 F.3d at 1295.[2]  The Court finds that the Policy's preexisting condition definition is

---

2      An insurer's decision on what to cover impacts the premium required to be paid for coverage.

unambiguous, and now evaluates whether Plaintiff's breast cancer constitutes a preexisting condition under the Policy.

2.  Application of Paragraph (A)

Plaintiff argues that paragraphs (A) and (B)(1) should be read conjunctively, not disjunctively.  That is, Plaintiff claims a preexisting condition exists under the Policy only where (A) and (B)(1) are *both* met, (B)(2) is met, or (C) is met. Plaintiff argues that its conjunctive interpretation should be adopted because the word "or" does not appear between paragraphs (A) and (B), and because Defendant otherwise could "exclude coverage for any condition merely by finding a doctor to agree with its opinion that the condition existed prior to the coverage period."  ([36]).  As explained earlier in this Order, Plaintiff's interpretation ignores the plain language and clear structure of the Policy.  A condition is "preexisting," under the Policy, if it meets the requirements of paragraph (A).

Paragraph (A) applies to "a condition for which medical advice, diagnosis, care, or treatment was recommended or received within the 60 months immediately preceding the date the covered person became insured under this policy."  (DSMF ¶ 9).  The words "medical advice, diagnosis, care, or treatment" are not defined in the Policy.  Georgia law defines "advice" as "an opinion or recommendation offered as a guide to action, conduct, etc." or "a recommendation

14

regarding a decision or course of conduct; specif[ically], that of professional

counsel." Bergan v. Time Ins. Co., 395 S.E.2d 361, 363 (Ga. Ct. App. 1990).  The

words "care" and "treatment," under Georgia law, "refer to something done in the

application of the curative arts, whether by drugs or other therapy, with the end in

view of alleviating a pathological condition." Mut. Life Ins. Co. of

New York v. Bishop, 209 S.E.2d 223, 225 (Ga. Ct. App. 1974).  "Thus surgery, in

its extended sense, may constitute 'care and treatment' when a mere examination

or evaluation does not." Id.  The Policy does not define the term "diagnosis," and

the parties do not cite a definitive definition of "diagnosis" in Georgia.  The Court

thus looks to the ordinary meaning of the word.  Alea London Ltd. v. Lee, 649

S.E.2d 542, 544 (Ga. Ct. App. 2007).  The dictionary defines "diagnosis" as "the

art or act of identifying a disease from its signs and symptoms" or "investigation or

analysis of the cause or nature of a condition, situation, or problem." Webster's

Third New International Dictionary 622 (2002).  "Although the term 'diagnosis'

may refer to either a diagnostic procedure or a diagnostic conclusion, it clearly

refers to a diagnostic procedure as used in [Plaintiff's] policy.  The policy states

that 'diagnosis' may be 'recommended or received.'  It would be unnatural to read

the policy as contemplating that a diagnostic result be 'recommended.'"

LoCoco v. Med. Sav. Ins. Co., 530 F.3d 442, 447 n.1 (6th Cir. 2008).

The medical advice, diagnosis, care, or treatment must have been "recommended or received." These terms also are not defined in the Policy. The common definition of "recommend" is "to advise, as an alternative; suggest (a choice, course of action, etc.) as appropriate, beneficial, or the like." Webster's Encyclopedic Unabridged Dictionary of the English Language 1612 (2001). The word "receive" means "to take into one's possession (something offered or delivered)," "to have (something) bestowed, conferred, etc.," "to have delivered or brought to one," or "to get or be informed of." Id. at 1610.

The medical advice, diagnosis, care, or treatment also must have been "for" the condition for which coverage is sought. The dictionary provides several definitions of the word "for," including (1) "intended to belong to, or be used in connection with: *equipment for the army; a closet for dishes*," (2) "suiting the purposes or needs of: *medicine for the aged*," and (3) "with regard or respect to: *pressed for time; too warm for April*." Id. at 747.

The Court finds that the radiologist's May Report "recommended" medical "diagnosis" "for" what ultimately was diagnosed as breast cancer. Plaintiff's April mammogram revealed calcifications in her right breast, which were "suggestive of possible cancer." (DuBois Dep. at 105, 116, 122-123, 172). The radiologist, in light of these "abnormal" results, recommended that Plaintiff "have follow-up

16

diagnostic procedures performed," namely, a second mammogram and an ultrasound of the right breast.  LoCoco, 530 F.3d at 446; (see DuBois Dep. at 119-121).  The radiologist "ma[de] it clear, by her recommendations, that she [was] concerned there might be cancer."  (DuBois Dep. at 114; see DuBois Dep. at 122 ("[W]hen a mammogram shows micro-calcifications, the first thought is are these micro-calcifications due to cancer.")).[3]  Breast cancer ultimately was found in the calcified area of concern for which diagnostic procedures were recommended.  (See DuBois Dep. at 162 ("[T]hat same [calcified] area was where that cancer was that had the calcium in it."); DuBois Dep. at 169 ("The abnormality on that [April] mammogram was in the same location . . . where the cancer was found when they did the mastectomy.")).  Plaintiff's breast cancer constitutes a preexisting condition under the Policy because it is a condition "for which . . . diagnosis . . . was

---

[3]     Plaintiff's second mammogram is described, in the radiologist's report, as a "diagnostic" mammogram.  ([36.3]).  "Diagnostic mammograms" are ordered "[w]hen there is an indication of an abnormality that may be a malignancy." (DuBois Dep. at 102).  Although the May Report assigned Plaintiff a BI-RADS score of 0, this indicated only that "additional evaluation" was required and did not rule out a cancer diagnosis.  ([9.7]).  A BI-RADS score of 0 "means the radiologist may have seen a possible abnormality, but it was not clear and [the patient] will need more tests, such as the use of spot compression (applying compression to a smaller area when doing the mammogram), magnified views, special mammogram views, or ultrasound."  American Cancer Society, https://www.cancer.org/cancer/breast-cancer/screening-tests-and-early-detection/mammograms/understanding-your-mammogram-report.html.

recommended . . . within the 60 months immediately preceding" Plaintiff's coverage date.  (DSMF ¶ 9).

Plaintiff argues that the radiologist's instruction to obtain an ultrasound and a second mammogram was not a pre-coverage "recommendation" because it was not *received* by Plaintiff until after coverage began.  The Court disagrees.  The Policy defines a preexisting condition as a condition for which diagnosis "was recommended."  (DSMF ¶ 9).  The ordinary meaning of "recommend" is "to suggest an act or course of action."  https://www.merriam-webster.com/dictionary /recommended; see Webster's Encyclopedic Unabridged Dictionary of the English Language 1612 (2001) (defining "recommend" as "to advise, as an alternative; suggest (a choice, course of action, etc.) as appropriate, beneficial, or the like"). This definition requires the making of the suggestion, but does not require actual receipt of the suggestion by the specific person about whom the suggestion is made.  The Court is not permitted to add limiting language, such as a knowledge or receipt of recommendation requirement, into the Policy.  See Nat'l Life & Acc. Ins. Co. v. Wilson, 127 S.E.2d 306, 308 (Ga. Ct. App. 1962) ("It is the function of the Court to construe a contract of insurance as it is written, and the Court by construction cannot . . . add words to the contract of insurance to either create or avoid liability.").

The radiologist's instruction to undergo an ultrasound and a second mammogram appears in a final, formalized, signed medical report issued more than a month before Plaintiff's insurance began.[4]  The instruction appears at the end of the report, next to the heading "Recommendation," and "suggest[s] an act or course of action."  ([9.7]).  That Plaintiff did not receive this formal recommendation until after the coverage date is irrelevant under the Policy's definition of a preexisting condition.[5]  The radiologist's suggestion, in the May Report, constitutes a recommendation,[6] and Plaintiff's breast cancer is a "preexisting condition" for which medical services are not covered under the Policy.  To import a receipt or knowledge requirement into the Policy would create inherent inconsistencies in coverage.  For example, a person diagnosed with malignant cancer who did not receive the diagnosis before her insurance effective date because she was traveling overseas, would be covered under the policy even though efforts were made to tell her of the condition.  A person in the same

---

[4]      The May Report is entitled "Final Report."  ([9.7]).

[5]      The decision here would be easier if Plaintiff's attending physician, or the radiologist, had more timely communicated the mammogram results and medical recommendations to Plaintiff.  It is not practical, however, for coverage to be determined based on whether a treating physician timely communicates with their insured patient.

[6]      Plaintiff, in her deposition, agreed that the radiologist "had a recommendation after she interpreted [Plaintiff's] mammogram."  (Pl. Dep. at 226).

19

circumstances would not receive coverage, however, if she was not traveling overseas and was called into her physician's office the day after the malignancy diagnosis was made.  This inconsistency is avoided by the Policy term that excludes coverage based on a preexisting condition.  The exclusion is not qualified by a receipt or knowledge requirement.

Other cases support that Plaintiff's breast cancer is a preexisting condition under the Policy.  The Georgia Court of Appeals, in Bergan v. Time Ins. Co., 395 S.E.2d 361 (Ga. Ct. App. 1990), considered a provision that defined a preexisting condition as "an illness or injury for which medical care, treatment, medicine or advice was received" six months before the effective date of the policy.  Id. at 362.  Two weeks before Bergan's insurance became effective, she visited her doctor, complaining about "symptoms of what she thought was a bladder infection."  Id.  The doctor examined Bergan, found a "mildly tender mass" on her pelvis, recommended a pelvic ultrasound, and referred her to a gynecologist.  Id.  The gynecologist found a "large pelvic mass extending into [Bergan's] abdominal region," and recommended "an exploratory laparotomy to evaluate and if possible, cure the problem."  Id.  After the effective date of her insurance, Bergan underwent an exploratory laparotomy "during which low grade cancer of the ovaries was found."  Id.  Bergan argued her ovarian cancer was not a

preexisting condition because it was not diagnosed until after the effective date of

her insurance coverage.  The Georgia Court of Appeals disagreed:

> When [the doctor] examined and tested Bergan, determining that her
> problems were being caused by a pelvic mass, he 'advised' her to see
> a gynecologist and to have an ultrasound examination.
> [The gynecologist] 'advised' further evaluation and treatment of the
> problem by means of an exploratory laparotomy.  Giving the language
> of the policy exclusion a reasonable construction without extending it
> beyond its plain terms, it can only be concluded that Bergan received
> medical advice for her illness prior to the effective date of coverage as
> contemplated in the exclusionary clause.

Id. at 363.

In LoCoco, the Sixth Circuit considered an insurance provision that defined

"preexisting condition" as "an injury or illness, including a pregnancy, for which

medical advice, *diagnosis*, care, or treatment, including use of prescription drugs,

was recommended or received" before coverage began.  LoCoco, 530 F.3d at 446

(emphasis added).  Mr. LoCoco experienced chest pain and a dry cough several

months before his insurance effective date.  His doctor instructed him to have a

chest X-ray "just to see if there was any process going on in the lungs."  Id. at 443.

A second chest X-ray was performed after LoCoco was admitted to an emergency

room, complaining of a cough and shortness of breath.  Id.  The X-ray revealed a

"cloud" in his left lung, and he was diagnosed with pneumonia.  Id.  His doctor

then referred him for a CAT scan "to determine 'if there's a mass in the lung,'"

noting that "[w]henever you see something like pneumonia in a smoker, you have to follow up for cancer of the lung" because "pneumonia can sometimes follow lung cancer."  Id.  When the CAT scan revealed "upper left lobe consolidation/collapse in the lungs," but not cancer, LoCoco's doctor suggested a bronchoscopy "for further evaluation."  Id.  LoCoco was diagnosed with lung cancer after the effective date of his insurance coverage.  The Sixth Circuit held that LoCoco's cancer was a preexisting condition under the policy because, after his chest X-ray revealed a "cloud" in his lung, he was advised "that he needed to have follow-up diagnostic procedures performed."  Id. at 446.  "The literal contractual requirements for a pre-existing condition were thus met:  prior to the effective date of coverage, his doctors recommended that he get a diagnosis of his illness."  Id.

Finally, in Bullwinkel v. New England Mut. Life Ins. Co., 18 F.3d 429 (7th Cir. 1994), the Seventh Circuit considered a preexisting condition insurance clause that provided "No benefits are payable for a condition, sickness, or injury for which you or your dependent were seen, treated, diagnosed, or incurred medical expense in the six-month period just before insurance starts."  Id. at 430. Bullwinkel had an ultrasound, days before the issuance of her policy, that revealed a cyst in her breast.  The doctor "made no definite conclusion whether the cyst was

cancerous or benign.  He assured [Bullwinkel], however, that more than likely the cyst was benign.  But he was concerned about the possibility of cancer.  He referred [Bullwinkel] to a surgeon for removal and biopsy of the cyst, telling her 'Let's be safe and take it out.'"  Id.  After her insurance began, Bullwinkel's cyst was removed and found to be cancerous.  The Seventh Circuit held that Bullwinkel's breast cancer was a preexisting condition:

> True, [Bullwinkel] was never 'seen, treated, diagnosed' specifically for breast cancer in July, nor did she incur medical expenses specifically for breast cancer in July.  But she was 'seen, treated, diagnosed' and she did incur medical expenses for a breast lump in July.  The lump was discovered in September to be cancerous.  We may infer from this fact that the lump was also cancerous in July.  So, even though [Bullwinkel] did not know the lump was cancerous in July, her visit with the doctor in that month concerning the lump actually concerned cancer.  It follows that [Bullwinkel] was 'seen' and 'treated' and incurred medical expenses for her cancer in July.  Therefore, any post-policy treatment concerning the same condition is not covered.

Id. at 432.

These cases support that Plaintiff's breast cancer is a preexisting condition under paragraph (A) of the Policy.  As in Lococo, Plaintiff was advised, after abnormal test results, "that [s]he needed to have follow-up diagnostic procedures performed" for a condition later diagnosed as cancer.  530 F.3d at 446.  Like Bullwinkel, the radiologist "was concerned about the possibility of cancer," and her recommendation, in the May Report, "actually concerned cancer."  18 F.3d at

23

430, 432; see also Bergan, 395 S.E.2d 361 (finding that plaintiff's cancer was a preexisting condition even though it was not diagnosed before coverage began). Plaintiff's breast cancer is a preexisting condition that is not covered under the Policy.

Even assuming that paragraph (A) of the "preexisting condition" definition did not apply, the undisputed evidence here is that Plaintiff had a preexisting condition not covered by her Policy.  Paragraph (B)(1) excludes coverage for a condition that "in the opinion of a qualified *doctor* . . . [b]egan prior to the date the *covered person* became insured" under the Policy.  (DSMF ¶ 9).  The record evidence here is that the breast abnormality identified on May 13, 2014, ultimately was diagnosed by a qualified doctor as breast cancer.  The April mammogram identified an abnormality that, on July 14, 2014, the radiologist characterized as "irregular" and "suspicious (BIRADS 4)."  ([36.3]; see Pl. Dep. at 186 ("The second [mammogram in July] diagnosed breast cancer.")).  The radiologist recommended an "ultrasound-guided biopsy" of the abnormality, which confirmed that Plaintiff had breast cancer.  ([36.3]; [9.8] at 3; see [36] ("The mass seen on the July 14 mamogram was biopsied in August of 2014 and resulted in a diagnosis of [breast cancer]."); DuBois Dep. at 151 ("[T]he biopsy was positive."); DuBois Dep. at 68 ("[T]he diagnosis was really not finally confirmed . . . unless you have a

biopsy."); DuBois Dep. at 96 ("[T]he area of concern [in the April mammogram] is the same area that was eventually diagnosed by – by pathology as the cancer.  So the condition she had before the effective date identified on the mammogram was the cancer.").  Neither Plaintiff nor Defendant disputes that the radiologist, and the doctors who performed the biopsy and diagnosed Plaintiff with breast cancer, were "qualified doctors."  In fact, both parties rely on the radiological diagnosis that Plaintiff had cancer, and they do not dispute that the abnormality diagnosed as breast cancer existed before the effective date of Plaintiff's insurance.  Paragraph (B)(1) of the "preexisting condition" definition excludes coverage for Plaintiff's diagnosed breast cancer.  Defendant is entitled to summary judgment on Plaintiff's breach of contract claim.

> B.    Counts 2-4:  Bad Faith, Attorney's Fees, and Punitive Damages

Counts 2 through 4 assert claims for breach of the implied covenant to act in good faith, punitive damages, bad faith under common law and O.C.G.A. § 33-4-6, and attorney's fees under O.C.G.A. § 13-6-11.  Plaintiff's breast cancer constitutes a preexisting condition that is not covered under the Policy, and Defendant's refusal to pay for Plaintiff's breast cancer treatment was not in bad faith and does not warrant punitive damages or liability for attorney's fees.  See InComm Holdings, Inc. v. Great Am. Ins. Co., No. 1:15-cv-2671, 2017 WL 1021749, at *11

(N.D. Ga. Mar. 16, 2017) ("Penalties and attorney's fees are available under section 33-4-6 only in the event of a loss which is covered by a policy of insurance."); Orr v. Dairyland Ins. Co., 273 S.E.2d 630, 631 (Ga. Ct. App. 1980) ("In the absence of basic liability by [the insurer], there likewise could have been no liability for statutory penalties or attorney fees.").  Defendant is entitled to summary judgment on Counts 2 through 4, and Defendant's Motion for Summary Judgment is granted.[7]

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Golden Rule Insurance Company's Motion for Summary Judgment [9] is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**.

---

[7]     Defendant objects to two exhibits submitted by Plaintiff in opposition to Defendant's Motion for Summary Judgment.  ([41]).  The exhibits include a screenshot from the Indiana Professional Licensing Agency's website, and four insurance policies issued by Defendant to nonparties in other states.  The exhibits, even if they were considered, would not impact the Court's conclusion that Defendant is entitled to summary judgment on all of Plaintiff's claims.

**SO ORDERED** this 2nd day of August, 2017.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE